1
2
3
4
5          IN THE UNITED STATES DISTRICT COURT
6              FOR THE DISTRICT OF ARIZONA
7
8  Center for Biological Diversity, et al.    )   No. CV 05-261-TUC-CKJ
                                              )
9          Plaintiffs,                        )   **ORDER**
                                              )
10 vs.                                        )
                                              )
11                                            )
   United States Department of Housing and    )
12 Urban Development, et al.                  )
                                              )
13         Defendants.                        )
                                              )
14 _____      )

15
         Pending before the Court is Defendants' Partial Motion for Protective Order and
16
   Motion for Judgment on the Pleadings which were contemporaneously filed with the Court.
17
    The Motion for Protective Order is fully briefed as a response and reply brief were
18
   subsequently filed with the Court.  However, as Plaintiffs argue that they are entitled to
19
   discovery in relation to the Partial Motion for Judgment on the Pleadings, they have not filed
20
   a response.  Rather, the parties have stipulated that only after the Court rules on the Motion
21
   for Protective Order, shall Plaintiffs be required to file a response to the Partial Motion for
22
   Judgment on the Pleadings.  However, as discussed below, the Court must rule on the issues
23
   in the Partial Motion for Judgment on the Pleadings in order to actually adjudicate the issues
24
   in the Motion for Protective Order.  As the briefs of the parties reflect, the issues implicated
25
   in the Motion for Protective Order and Partial Motion for Judgment on the Pleadings overlap;
26
   as such, these overlapping issues must be addressed in this Order.
27
28

1 **I. STANDARDS OF REVIEW**

2     **A. Motion for Protective Order Pursuant to FED.R.CIV.P. 26(c)**

3     Courts have the discretion to grant protective orders pursuant to FED.R.CIV.P. 26(c) 4 ("Rule 26"), which states in relevant part: "Upon motion by a party or by the person from 5 who discovery is sought . . . the court . . . may [for good cause shown] make any order which 6 justice requires to protect a party from annoyance, embarrassment, oppression, or undue 7 burden or expense . . ." Generally, courts have "broad latitude to grant protective orders to 8 prevent disclosure of materials for many types of information . . ." See *Phillips ex rel. Estates 9 of Byrd v. General Motors Corp.*, 307 F.3d 1206, 1211-1212 (9th Cir. 2002); FED.R.CIV.P. 10 26(c)(a court may order that "certain matters not be inquired into, or that the scope of the 11 disclosure or discovery be limited to certain matters."). A court's ruling on a motion for a 12 protective order is reviewed for an abuse of discretion. *Id.* at 1209. "For good cause to exist, 13 the party seeking protection bears the burden of showing specific prejudice or harm will 14 result if no protective order is granted." *Id.* 1210-1211; *See also Beckman Indus. Inc. v. Int'l 15 Ins. Co.*, 966 F.2d 470, 476 (9th Cir. 1992)("broad allegations of harm, unsubstantiated by 16 specific examples or articulated reasoning, do not satisfy the Rule 26(c) test.").

17     **B. Motion for Judgment on the Pleadings Pursuant to FED.R.CIV.P. 12(c)**

18     Defendants' Motion pursuant to FED.R.CIV.P. 12(c) is reviewed under the same 19 standard as a motion to dismiss for failure to state a claim pursuant to FED.R.CIV.P. 12(b)(6). 20 The dispositive issue raised by a Rule 12(b)(6) motion is whether the facts as pleaded, if 21 established, support a valid claim for relief. *See Neitzke v. Williams*, 490 U.S. 319, 328-329 22 (1989). In reviewing a motion to dismiss for failure to state a claim, this Court's review is 23 limited to the contents of the complaint. *See Clegg v. Cult Awareness Network*, 18 F.3d 752, 24 754 (9th Cir. 1994). All allegations of material fact in the complaint are taken as true and 25 construed in the light most favorable to the nonmoving party. *Id*. A complaint should not 26 be dismissed unless it appears beyond doubt that a plaintiff can prove no set of facts in 27 support of his claim that would entitle him to relief. *Id*. As a general matter, a "motion to 28 dismiss for failure to state a claim is viewed with disfavor and is rarely granted." *Gilligan*

*v. Jamco Develop. Corp.*, 108 F.3d 246, 249 (9th Cir. 1997). To the extent that matters outside the pleadings are presented and not excluded by the Court, a motion for judgment on the pleadings is converted into a motion for summary judgment. FED.R.CIV.P. 12(c).

## II. BACKGROUND

### A. Statutory and Regulatory Background

#### 1. The National Environmental Policy Act

The National Environmental Policy Act ("NEPA") has two goals: "First, it places upon [a federal] agency the obligation to consider every significant aspect of the environmental impact of a proposed action. Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decision making process." *Kern v. U.S. Bureau of Land Management*, 284 F.3d 1062, 1066-1067 (9th Cir. 2002)(internal quotes and citations omitted). Pursuant to the NEPA, federal agencies must "prepare an [Environmental Impact Statement ("EIS")] prior to taking 'major Federal actions significantly affecting the quality' of the environment. *Id.*; 42 U.S.C. §4332(2)(C). "Some proposed federal actions categorically require the preparation of an EIS. If the proposed action does not categorically require the preparation of an EIS, the agency must prepare an [Environmental Assessment ("EA")] to determine whether the action will have a significant effect on the environment . . . If the EA reveals that the proposed action will significantly affect the environment, then the agency must prepare an EIS. If the EA reveals no significant effect, the agency may issue a Finding of No Significant Impact." *Id.*; 40 C.F.R. §§1501.4, 1508.9 (regulations addressing NEPA).

#### 2. The Endangered Species Act

Section 7 of the Endangered Species Act ("ESA") requires each federal agency to ensure that any action authorized, funded, or carried out by that agency "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of designated critical habitat. 16 U.S.C. § 1536(a)(2). "'Jeopardize the continued existence of' means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of

both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 502.02. "'Destruction or adverse modification' means a direct or indirect alteration that appreciably diminishes the value of critical habitat for both the survival and recovery of a listed species. Such alterations include, but are not limited to, alterations adversely modifying any of those physical or biological features that were the basis for determining the habitat to be critical." *Id.*

In order to achieve these objectives, the agency proposing the action must consult, as relevant to this litigation, with the United States Fish and Wildlife Service ("FWS") whenever its action "may affect" a threatened or endangered species. 50 C.F.R. § 402.14(a). If the agency determines that its action will have "no effect" on an endangered or threatened species, it need not engage in "formal consultation" and the USFWS need not concur in this determination. *See Southwest Center for Biol. Div. v. United States Forest Service,* 100 F.3d 1443, 1447-48 (9th Cir. 1996); *Pacific Rivers Council v. Thomas,* 30 F.3d 1050, 1054 n. 8 (9th Cir. 1994), *cert. denied*, 514 U.S. 1082 (1995). If an agency determines that its action "may affect," it must engage in "formal consultation" unless the agency determines with the concurrence of the USFWS that the action is "not likely to adversely affect" the listed species or critical habitat. 50 C.F.R. § 402.14(a), (b). Formal consultation typically begins with a written request and the issuance of a biological assessment ("BA") by the action agency (*see* 50 C.F.R. § 402.14(c)), and concludes with the issuance of a biological opinion ("BO") by the consulting agency. *See* 50 C.F.R. § 402.14(l)(1). The BO assesses the likelihood of jeopardy to the species and whether the proposed action will result in the destruction or modification of critical habitat. *See* 50 C.F.R. § 402.14(g).

### 3. The Administrative Procedure Act and its relevance to the NEPA and the ESA

The NEPA does not provide an independent cause of action where a federal agency allegedly violates NEPA procedures; as such, a challenge to a federal agency's noncompliance with NEPA procedures is reviewed under the Administrative Procedure Act ("APA"). *See* 5 U.S.C. §701 *et seq.; Ecology Center, Inc. v. Austin*, 430 F.3d 1057, 1062 (9th

Cir. 2005). The APA allows parties to challenge only "final agency action" and agency actions are reviewed under the arbitrary, capricious, or an abuse of discretion standard. *Id.; see also Lujan v. Nat'l Wildlife Fed.,* 497 U.S. 871, 891-94 (1990).

In contrast to the NEPA, the ESA does create an independent cause of action. Under 16 U.S.C. § 1540(g), a party may file suit "to enjoin any person, including the United States and any other governmental . . . agency . . . who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof." 16 U.S.C. § 1540(g)(1)(A). Thus, a party may file suit against a federal agency under this citizen suit provision concerning agency compliance with the ESA. *See Bennett v. Spear,* 520 U.S. 154, 172-73 (1997); *E.P.A. v. The Simpson Timber Co.,* 255 F.3d 1073, 1078-79 (9th Cir. 2001). In addition, as both parties recognize, the Ninth Circuit has held that a citizen-suit under the ESA does not need to challenge a final agency action. *See Washington Toxics Coalition v. Environmental Protection Agency*, 413 F.3d 1024, 1034 (9th Cir. 2005).

## B. Factual Background

In Plaintiffs' First Amended Complaint ("Complaint"), they seek relief against Defendants for failing to comply with the NEPA and the ESA. In Counts One through Six, Plaintiffs allege that the U.S. Department of Housing and Urban Development ("HUD"), the Small Business Administration ("SBA"), and the U.S. Department of Veterans' Affairs ("VA") provide mortgage insurance, loan guarantees, and loans ("financial assistance") for residential and commercial development in Sierra Vista, Arizona. These developments pump from an aquifer that supplies water to the San Pedro River. Plaintiffs allege that this contributes to excessive ground water pumping below Sierra Vista which threatens the natural resources dependent on the San Pedro River and the San Pedro National Conservation Area, including threatened and endangered species such as the Huachuca Water Umbel (a semi-aquatic plant) and the Southwestern Willow Flycatcher (a bird).

In the course of providing this financial assistance, Plaintiffs allege in Counts One through Three that Defendants failed to comply with NEPA "each and every" time they provided financial assistance because they failed to review the environmental impacts of their

1    actions. Jurisdiction over the NEPA claims in Counts One through Three stems from the
2    Administrative Procedures Act ("APA").

3    In Counts Four though Six of the Amended Complaint, Plaintiffs allege that
4    Defendants failed to comply with the ESA "each and every" time they provided financial
5    assistance because they failed to consult with the U.S. Fish and Wildlife Service ("FWS")
6    to assess impacts on threatened and endangered species. In contrast to Counts One through
7    Three, jurisdiction over these claims does not stem from the APA, but stems directly from
8    the citizen suit provision in the ESA which allows private citizens or groups to directly
9    challenge government actions which are purportedly in violation of obligations imposed
10   under the ESA. Thus, Plaintiffs seek injunctive and declaratory relief forcing Defendants to
11   comply with the NEPA and the ESA.

## III. DISCUSSION

### A. Counts One through Three: NEPA Violations and APA Jurisdiction

In Defendants' Partial Motion for Judgment on the Pleadings, Defendants argue that when taking all of the allegations in relation to Counts One though Three of the Complaint as true, these claims must be dismissed as the Court does not have subject matter jurisdiction over these claims as Plaintiffs are making a broad, programmatic challenge prohibited by *Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871 (1990). As such, in the Motion for a Protective Order, Defendants argue that discovery is completely unnecessary as the Court can adjudicate the jurisdictional claims as to Counts One through Three based on the face of the Complaint, and discovery would not change the fact that Plaintiffs are seeking broad, programmatic relief.

In *Lujan*, the plaintiff challenged the Bureau of Land Management's ("BLM") "land withdrawal review program" which covered the BLM's activities in complying with the Federal Land Policy and Management Act ("FLPMA"). *Id.* at 890. The plaintiff challenged the continuing operations of the BLM in reviewing land withdrawal applications, the classifications of public land, and developing land use plans as required by the FLPMA. *Id.* at 890. The Supreme Court rejected the plaintiff's claim as it did not challenge an "agency

1  action" within the meaning of §702 of the APA, much less a "final agency action" within the

2  meaning of §704 of the APA; the Supreme Court stated in relevant part:

> 3  Respondent alleges that violation of the law is rampant within this program .
> . . Perhaps so. But respondent cannot seek *wholesale* improvement of this
> 4  program by court decree, rather than in the offices of the Department or the
> halls of Congress, where programmatic improvements are normally made.
> 5  Under the terms of the APA, respondent must direct its attack against some
> particular "agency action" that causes it harm. Some statutes permit broad
> 6  regulations to serve as the "agency action," and thus to be the object of judicial
> review directly, even before the concrete effects normally required for APA
> 7  review are felt. Absent such a provision, however, a regulation is not
> ordinarily considered the type of agency action "ripe" for judicial review under
> 8  the APA until the scope of the controversy has been reduced to more
> manageable proportions, and its factual components fleshed out, by some
> 9  concrete action applying the regulation to the claimant's situation in a fashion
> that harms or threatens to harm him.

10  *Id.* at 891.

11  Relying on *Lujan*, Defendants argue that a review of Plaintiffs' Complaint shows that

12  the claims and relief sought are exactly the type of broad, programmatic attacks rejected in

13  *Lujan*. Defendants argue that Counts 1 through 3 are a broad, generic attack on the agencies

14  compliance with NEPA in administering their financial assistance programs, rather than an

15  attack on specific agency actions. For example, Defendants emphasize that Plaintiffs allege

16  that the agencies violate NEPA "each and every time" the respective agencies render

17  financial assistance in the Sierra Vista sub-basin. *See* Complaint at ¶¶58, 61, 65 (alleging

18  that HUD, the VA, and the SBA have not conducted any or adequate environmental analysis

19  in accordance with NEPA upon issuing each and every mortgage insurance, loan guarantee,

20  loan, or financial assistance in the Sierra Vista sub-basin). Further, Defendants argue that

21  Plaintiffs' request for declaratory and injunctive relief also reflects Plaintiffs' broad request

22  seeking the agencies' general compliance with NEPA. *See* Complaint, Prayer for Relief at

23  ¶¶1, 3 ("Declare that Defendants . . . have violated and continue to violate NEPA upon

24  providing mortgage insurance for home loans, guarantees for home loans, and financial

25  assistance to small businesses in the Sierra Vista sub-basis); ¶¶2, 4 (asking the Court to order

26  the agencies to "prepare the applicable NEPA documents, and analyze and disclose all

27  environmental impacts of its actions in the Sierra Vista sub-basin and "consult with the FWS

28

1  regarding the effects of their actions in the Sierra Vista sub-basin."). As such, Defendants
2  argue that Plaintiffs' broad, programmatic claims must be dismissed pursuant to *Lujan*.

3  Furthermore, Defendants argue that Plaintiffs' citation and summary of hundreds of
4  various financial assistance actions taken in the Sierra Vista sub-basin does not convert
5  Plaintiffs' broad, programmatic challenge into justiciable claims. For example, Plaintiffs
6  allege that in the Sierra Vista sub-basin: (1) HUD has insured or guaranteed over 800 home
7  loans from 1999 to 2004; (2) as of November 2004, HUD is considering 805 pending
8  mortgage insurance or loan guarantee applications; (3) the VA has provided 5,179 home loan
9  guarantees between 1992 to 2004 and continue to provide home loan guarantees; and (4) the
10 SBA has provided approximately $8.5 million in financial assistance between 2001 and
11 2004. *See* Complaint at ¶¶35, 38, 39.

12 Defendants emphasize that Plaintiffs do not identify or seek specific relief against any
13 particular loan or loan guarantee, but simply use these as examples to justify an order
14 extending to "each and every" form of financial assistance provided by these Defendants in
15 the Sierra Vista sub-basin; Defendants argue that this is also prohibited and does not change
16 the nature of Plaintiffs' programmatic attack. *See Lujan*, 497 U.S. at 893-894 ("[I]t is at least
17 entirely certain that the flaws in the entire 'program'-consisting principally of the many
18 individual actions referenced in the complaint, and presumably actions yet to be taken as well
19 - cannot be laid before the courts for wholesale correction under the APA, simply because
20 one of them that is ripe for review adversely affects one of respondent's members.").[1]

---

[1] *See also Sierra Club v. Peterson*, 228 F.3d 559, 567 (5th Cir. 2000)("Nor is this programmatic challenge made justiciable by the fact that the environmental groups identified some specific sales in their pleadings that they argue are final agency actions. The environmental groups can challenge 'a specific 'final agency action' [which] has an actual or immediately threatened effect," even when such a challenge has "the effect of requiring a regulation, a series of regulations, or even a whole 'program' to be revised by the agency' . . . However, this ability does not allow the environmental groups to challenge an entire program by simply identifying specific allegedly-improper final agency actions within that program, which is precisely what they did here. Rather than limit their challenge to individual sales, they merely used these sales as evidence to support their sweeping argument that the Forest Service's 'on-the-ground' management of the Texas forests over the last twenty years violates the NFMA [National Forest Management Act]. This is clear from

1    In response, Plaintiffs largely discuss the general standards for discovery and
2 protective orders, that discovery may be appropriate regarding jurisdictional challenges, the
3 definition of final agency action, and that the issue of final agency action is a factual question
4 entitling Plaintiffs to discovery. *See* Plaintiffs' Response at 5-13.  However, Defendants do
5 not dispute these general standards, but argue that assuming all of Plaintiffs' allegations are
6 true and they identify final agency actions, their claims nevertheless must be dismissed as
7 they are impermissible, programmatic attacks on the routine activities of the agencies.  As
8 both parties recognize, however, discovery may be denied where it is clear that further
9 discovery would not demonstrate sufficient facts to support jurisdiction.

10    In regards to Defendants' main position regarding prohibited programmatic attacks
11 based on *Lujan*, Plaintiffs state that as a factual matter that their claims and requested relief
12 do not fit the construct of *Lujan*.  However, they do not adequately show how their claims
13 and requested relief fall outside of *Lujan*.  As discussed above, it appears that the claims and
14 relief in question actually fall squarely within *Lujan*.

15    Next, Plaintiffs argue that once final agency action is demonstrated, even an agency
16 program can be challenged and the scope of the remedy does not undermine jurisdiction.  To
17 support this claim, Plaintiffs cite a portion of *Lujan* stating a challenge to a final agency
18 action "may ultimately have the effect of requiring a regulation, a series of regulations, or
19 even a whole 'program' to be revised by the agency in order to avoid the unlawful result that
20 the court discerns." *Lujan*, 497 U.S. at 894.[2]  However, reading this quote in context, and as

---

their allegations, which addressed the entire Texas forests, from their evidence, which concerned practices throughout the Texas forests and which dated back to implementation of the NFMA, and from their requested relief . . . The scope of the environmental groups' claims and the relief they obtained go well beyond any challenge to discrete sales. Both make clear that the environmental groups improperly obtained 'a general judicial review of the [Forest Service's] day-to-day operations' . . .")(citations omitted); *National Wildlife Federation v. Caldera*, 2002 WL 628649 (D.D.C. 2002)(same).

[2]Plaintiffs also cite to *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1067 (9th Cir. 2002) to support this proposition.  The cited portion of the opinion repeats the quoted portion above from *Lujan*.  In addition, unlike this case, the *Neighbors of Cuddy Mountain* case involved

- 9 -

1  discussed above, the Supreme Court made clear that simply identifying final agency actions
2  as examples of flaws in the entire program does not permit a party to lay the entire program
3  before the courts for wholesale correction under the APA. *See id.* at 890-894.

4        Plaintiffs also argue that the Ninth Circuit has held that APA jurisdiction is available
5  to challenge a series of similar final agency actions, and then proceeds to cite several cases.
6  *See* Response at 14. However, Defendants argue that the cases relied on by Plaintiffs do not
7  alter the principles in *Lujan*, and also argue that the court in each case found that Plaintiffs
8  had limited their suit to specific final agency actions. The Court agrees. *See, e.g.*, *High
9  Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 639 (9th Cir. 2004)(finding that "High Sierra
10 has alleged specific discrete agency actions taken by the Forest Service that have caused
11 harm. High Sierra did not challenge the entirety of the wilderness plan, but instead
12 challenged certain agency actions, for example the grant of certain special-use permits, and
13 the calculation of certain trailhead limits."); *Idaho Watersheds Project v. Hahn*, 307 F.3d
14 815, 828 (9th Cir. 2002)(addressing exhaustion issues as opposed to the broad, programmatic
15 issues in *Lujan*); *Idaho Conservation League v. Mumma*, 956 F.2d 1510, 1510, 1519 (9th Cir.
16 1992)(allowing an APA challenge to the Forest Service's decision not to recommend
17 wilderness designation for 43 roadless forest areas in the Idaho Panhandle Forest); *Friends
18 of the Earth v. Watson*, 2005 WL 2035596, \*6 (N.D Cal. 2005)(allowing APA challenges to
19 the "agencies discrete determinations that the projects they support, do not, on a cumulative
20 basis, have a significant environmental impact").

21       Plaintiffs also generally assert that to the extent Defendants are proposing that
22 Plaintiffs bring hundreds of cases, this would be an immensely inefficient use of resources
23 and that they believe these hundreds of cases would nonetheless be consolidated before one
24 judge. However, as Defendants correctly argue, *Lujan* addressed this issue. After the Court

---

26 allegations of numerous forestry guidelines to show that a specific timber sale was an unlawful final
27 agency action; here, Plaintiffs cite hundreds of examples of financial assistance rendered by the
   agencies and claim that "each and every" past and continuing action of financial assistance is
28 unlawful. *Id.* at 1067-1069.

explained that identifying final agency actions as examples of flaws in the entire program does not permit a party to lay the entire program before the courts for wholesale correction under the APA, it went on to state:

> The case-by-case approach that this requires is understandably frustrating to an organization such as respondent, which has as its objective across-the-board protection of our Nation's wildlife and the streams and forests that support it. But this is the traditional, and remains the normal, mode of operation of the courts. Except where Congress explicitly provides for our correction of the administrative process at a higher level of generality, we intervene in the administration of the laws only when, and to the extent that, a specific "final agency action" has an actual or immediately threatened effect . . . Such an intervention may ultimately have the effect of requiring a regulation, a series of regulations, or even a whole "program" to be revised by the agency in order to avoid the unlawful result that the court discerns. But it is assuredly not as swift or as immediately far-reaching a corrective process as those interested in systemic improvement would desire. Until confided to us, however, more sweeping actions are for the other branches.

*Id.* at 894; *see also Peterson*, 228 F.3d at 567; *Caldera*, 2002 WL 628649; *Defenders of Wildlife v. Flowers*, 2003 WL 22143270 (D. Ariz. 2003), *aff'd* 414 F.3d 1066 (9th Cir. 2005) Accordingly, Plaintiffs' argument is undermined by *Lujan*.

As the foregoing discussion reflects, the claims and relief Plaintiffs request are the type of broad, programmatic attacks rejected by *Lujan*. Further, it appears that to the extent Plaintiff has identified any specific, final agency actions, they seem to be only examples of the alleged overall, ongoing violations of NEPA by the Defendants each and every time they render any type of financial assistance in the Sierra Vista sub-basin. Indeed, even though these past actions of financial assistance allegedly violated NEPA each and every time, Plaintiffs state in their response: "Plaintiffs do not request that any past actions providing financial assistance be changed." *See* Response at 4. It appears then that any agency action identified would simply be examples of the future, ongoing NEPA violations by Defendants in the Sierra Vista sub-basin which is insufficient to trigger APA jurisdiction following the reasoning of *Lujan*. Thus, assuming all of the allegations related to Counts One through Three are true, the Court does not have jurisdiction over these claims and further discovery would be futile; as such, Defendants' Motion for Protective Order as to these counts is granted.

**B. Counts Four through Six: ESA Violations and Jurisdiction**

As a review of the Complaint and briefs show, Counts Four through Six are making essentially the same factual allegations regarding the fact that HUD, the VA, and the SBA are violating the ESA (instead of the NEPA/APA) each and every time they render financial assistance in the Sierra Vista sub-basin.  In addition, the Prayer for Relief regarding Counts Four though Six are again asking the Court to broadly declare that HUD, the VA, and the SBA have violated and are violating the ESA (instead of the NEPA/APA) each and every time they provide financial assistance, and asks the Court to force them to consult regarding the environmental impact of such actions on relevant threatened and endangered species and habitat in the Sierra Vista sub-basin in compliance with the ESA.

In light of the glaring similarities between Counts One through Three and Counts Four through Six, Defendants essentially make the same argument as to why these claims are non-justiciable as they are generic, overly broad claims seeking to change the daily operations of the agencies.  *See* Defendants' Partial Motion for Judgment on the Pleadings ("MJP") at 10-13.

As Defendants concede and Plaintiffs emphasize, the Ninth Circuit held in June of 2005 that unlike APA jurisdiction, final agency action is not required to invoke jurisdiction under the ESA citizen suit provision.  *See Washington Toxics Coalition v. Environmental Protection Agency*, 413 F.3d 1024, 1034 (9th Cir. 2005), *cert. denied*, 126 S. Ct. 1024 (2006). The court in *Washington Toxics Coalition* stated in relevant part:

> Intervenor . . . argues that the district court erred by not applying the APA and its limited provision for judicial review of final agency action. The APA provides judicial review for "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. §704. The district court correctly held, however, that the ESA citizen suit provision creates an express, adequate remedy. That provision states: "[A]ny person may commence a civil suit on his own behalf ⋯ to enjoin any person, including the United States and any other governmental instrumentality or agency ⋯ who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof." 16 U.S.C. §1540(g)(1).  Because this substantive statute independently authorizes a private right of action, the APA does not govern the plaintiffs' claims. Plaintiffs' suits to compel agencies to comply with the substantive provisions of the ESA arise under the ESA citizen suit provision, and not the APA.

- 12 -

1  *Id.*

2  Although it is logical that Defendants argument (broad, generic claims as non-
3  justiciable) as to Counts One through Three would also apply to Counts Four through Six,
4  Defendants do not have adequate legal support for this position after the decision in
5  *Washington Toxics Coalition*. A review of Defendants' Partial Motion for Judgment on the
6  Pleadings shows that Defendants do not cite any controlling authority or any appellate
7  authority to support their position. *See* MJP at 10-13. Initially, Defendants simply cite the
8  relevant provisions of the ESA regarding a citizen suit provision and the ESA provision
9  requiring federal agencies to ensure that their actions do not threaten the continued existence
10 or critical habitat of threatened or endangered species. *See* MJP at 11. Defendants then argue
11 that Plaintiffs have not specifically shown a violation of the ESA, but have only made broad,
12 generic claims which is inadequate to demonstrate a violation of the ESA; Defendants,
13 however, do not cite any authority to support this position.

14 In addition, it appears that Plaintiffs have alleged sufficient facts in light of the
15 decision in *Washington Toxics Coalition* to sustain the ESA claims. The ESA requires
16 agencies to consult with the FWS to determine if its action may affect a threatened or
17 endangered species; as Plaintiffs have alleged that Defendants failed to undertake this
18 consultation in relation to the threatened Southwestern Willow Flycatcher and the
19 endangered Huachuca Water Umbel, it appears that Plaintiffs have alleged a violation of the
20 ESA triggering jurisdiction under the citizen suit provision. *See* 16 U.S.C. § 1536(a)(2); 50
21 C.F.R. § 402.14. As relevant to this dispute, Plaintiffs' Complaint alleges that the
22 Defendants' financial assistance has fueled additional growth in the Sierra Vista sub-basin.
23 This new growth and development necessitates additional ground water pumping resulting
24 in decreased water flow of the San Pedro River which detrimentally affects wildlife such as
25 the two species at issue; nonetheless, Plaintiffs allege that Defendants have failed to consult
26 with the FWS regarding its actions in direct violation of the ESA.

27 Further, the Supreme Court in *Lujan* and the Fifth Circuit case in *Peterson* cited by
28 Defendants were analyzed by those courts in the context of failing to meet the final agency

1  action requirement of the APA as the parties made generic, broad, programmatic attacks.
2  After the Ninth Circuit's finding in *Washington Toxics Coalition* that final agency action is
3  not required for ESA jurisdiction, this Court can not appropriately apply the limits discussed
4  in *Lujan* and *Peterson* to Counts Four through Six under the ESA. Without any controlling
5  or appellate authority, Defendants are essentially asking this Court to apply the *Lujan* limits
6  to this case. The only other authority cited by Defendants are not helpful to their position.
7  The Defendants cite the general law regarding waivers of sovereign immunity, but none of
8  it is specific to the issues at hand or otherwise helpful. *See* Defendants MJP at 12, lines 4-17.
9  Defendants also cite two orders by the same U.S. district court judge (Judge James
10 Robertson) in the District of Columbia whereby he dismissed both the ESA and APA claims
11 for lack of jurisdiction because broad, programmatic claims are improper. *See* Defendants
12 MJP at p. 12, line 23 to p. 13, line 5; *National Wildlife Federation v. Caldera*, 2002 WL
13 628649 (D.D.C. 2002); *National Wildlife Federation v. Brownlee*, 2005 WL 3254196, 4
14 (D.D.C. 2005)(simply reaffirming the holding in *Caldera*). A review of the *Caldera* case
15 shows, however, that the court did not explain why the dismissal of the APA claims pursuant
16 to *Lujan* (broad, programmatic claims) was also applicable to the ESA claims which has a
17 separate basis for jurisdiction under the citizen suit provision. Nevertheless, a district court
18 decision from the District of Columbia is not controlling and the Ninth Circuit (which is
19 controlling) subsequently held that the APA's final agency action requirement is inapplicable
20 to the ESA.

21 Accordingly, as Defendants do not have the necessary legal authority to support their
22 position as to Counts Four through Six as reflected in the Partial Motion for Judgment on the
23 Pleadings, the Motion for Protective Order is denied.

### C. Defendants' Request to Limit the Scope of Interrogatories and Requests for Production

The last issue to address is whether the scope of discovery should be limited as requested by Defendants. Generally, Defendants argue that Plaintiffs' interrogatories and requests for production are improper because the discovery requests are not limited to

- 14 -

1  jurisdictional issues (i.e. the requests are overly broad) and the information sought is
2  available to the general public via statutes, regulations, and agency web sites. *See* Motion
3  for Protective Order at 5-7. Defendants also specifically object to interrogatory number 8
4  (asking for personal information on applicants) as raising privacy concerns and interrogatory
5  number 11 (concerning a HUD project from 1983 whereby it prepared NEPA documents)
6  as irrelevant to the current dispute. *See id.* at 7-8.

7  As to Defendants general objections regarding overly broad requests, Plaintiffs argue
8  that this information is necessary to show final agency action[3] and therefore should be
9  permitted as the requests are limited to a reasonable span of time. *See* Plaintiffs' Response
10  at 15. Plaintiffs argue that the basic information available to the public as argued by
11  Defendants is insufficient and Defendants have failed to show any prejudice in having to
12  produce this information. *See id.* at 16. Plaintiffs indicate that they are willing to forego
13  some of the personal information requested from Defendants (i.e. applicants' names,
14  addresses, phone numbers, etc.), but assert that Defendants have failed to show a violation
15  of any privacy. *See id.* at 16. Lastly, Plaintiffs argue that information regarding HUD's
16  attempt to comply with the NEPA in the Sierra Vista area in relation to a 1983 project is
17  directly relevant to the case at bar whereby HUD failed to undertake any NEPA analysis in
18  relation to current Sierra Vista projects. *See id.* at 16-17.

19  Although the parties briefed their positions relating to the interrogatories and requests
20  for production as summarized above, these issues are now moot. Plaintiffs were only seeking
21  discovery based on the premise that they needed this jurisdictional discovery/information to
22  justify jurisdiction in light of Defendants' Motion for Judgment on the Pleadings which
23  argued that there was no jurisdiction for Counts One through Six.

---

[3] However, final agency action is only relevant to Counts 1 through 3 pursuant to the NEPA and the APA. The Court has found that Counts 1 through 3 are not viable as they seek programmatic relief, and therefore discovery to show final agency action as to Counts 1 through 3 is prohibited. As final agency action is not required to show jurisdiction under the ESA, Plaintiff's final agency action justification is irrelevant as to Counts 4 through 6 under the ESA.

1   Although the Motion for Judgment on the Pleadings has not been fully briefed, the
2   parties stipulated to a briefing schedule which compelled the Court to rule on the merits of
3   the Motion for Judgment on the Pleadings as this was required to actually address the Motion
4   for Protective Order. Indeed, Defendant's Motion for Protective Order relied on the
5   arguments made in the Motion for Judgment on the Pleadings; further, Plaintiffs addressed
6   the merits of the Motion for Judgment on the Pleadings in it responsive brief opposing the
7   Motion for Protective Order. Accordingly, the parties have already had the opportunity to
8   substantively address the issues in the Motion for Judgment on the Pleadings. The Court
9   has ruled that discovery as to Counts One through Three is impermissible as these are non-
10  justiciable claims seeking broad, programmatic relief; thus, in denying discovery as to
11  Counts One through Three, the Court has necessarily ruled that Counts One through Three
12  must be dismissed for lack of jurisdiction as argued in Defendants' Motion for Judgment on
13  the Pleadings. In addition, as discussed in detail above, Defendants' argument that no
14  discovery is permitted as to Counts Four through Six because there is no jurisdiction for these
15  claims has already been rejected by the Court. Thus, the Court has necessarily denied
16  Defendants' Motion for Judgment on the Pleadings as to Count Four through Six as there is
17  jurisdiction for these claims. In light of these findings, Plaintiffs' request for jurisdictional
18  discovery as to Counts One through Three are denied as moot as these claims are dismissed
19  as non-justiciable. Further, Plaintiffs' request for jurisdictional discovery as to Counts Four
20  through Six are denied as moot as the Court has already rejected Defendants' position that
21  there is no jurisdiction for these claims.

## V. **CONCLUSION**

Accordingly, IT IS HEREBY ORDERED as follows:

(1) Defendants' Motion for Protective Order is **granted in part and denied in part**;

(2) Defendants' Partial Motion for Judgment on the Pleadings is **granted in part and denied in part;**

(3) A second Rule 16 telephonic conference will be held in the above entitled action on **June 23, 2006** at the hour of **10:00 a.m.** before Judge Jorgenson's law clerk, **Kevin Rudh** at **(520)**

**205-4551.** Plaintiff's counsel shall initiate the status conference by calling the law clerk with both parties on the line.  Counsel shall file with the Court, on or before **June 19, 2006**, a **joint report** reflecting the results of their meeting and outlining the discovery plan.  The parties shall refer to the Court's original Order setting up the initial Rule 16 Conference for guidance.

DATED this 12th day of May, 2006.

_____
Cindy K. Jorgenson
United States District Judge